Harry Herberger, Appellee, v. Anderson Motor Service Company, Appellant.

Gen. No. 8,612.

404

Heard in this court at the January term, 1932. Opinion filed October 17, 1932. Rehearing denied January 4, 1933.

HOOPES & PEFFERLE, for appellant.

C. A. LIVINGSTONE and L. E. STONE, for appellee.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

The appellee, Harry Herberger, commenced this suit in the circuit court of Sangamon county to recover damages from the appellant, Anderson Motor Service Company, which is engaged in the business of operating a large freight truck and "box car trailers" attached, along and upon the hard surfaced highways of the State. The damages sought to be recovered are for alleged injuries suffered by the appellee as the result of a collision with appellant's trailer, on the night of September 28, 1930, when the automobile in which appellee was riding crashed into the rear end of one of the trailers mentioned, which at that time the appellant was operating along the hard surfaced highway known as "Route 4," one mile south of Virden. There was a jury trial in the case; and it resulted in a verdict and judgment for $6,000 against the appellant. This appeal is prosecuted from the judgment.

The collision referred to occurred about 10 o'clock p. m. at a point on Route 4 adjacent to the crossing of the C. B. & Q. Railroad. The circumstances under which the collision was brought about appear in the testimony of Thomas Spiers, the driver of the automobile taxicab in which appellee was riding. Spiers testified as follows:

"We went north and east all of the way until we got a short ways south of the Burlington tracks and turned north again and right there was where the wreck occurred. The last turn is approximately a mile and a quarter or a mile and a half from Virden. As we were approaching the turn I looked down the dirt road to the south and saw the train. . . . I was going east until I turned. The dirt road is about a quarter of a mile long from the edge of the hard road up to the railroad track, and is on an angle. As we made the turn we saw the train on the track. This track was approximately a quarter of a mile, two or

three blocks away. The train was south of the dirt road, I don't know for sure but about 200 feet. It was a freight train with a heavy drag. I am familiar with the speed of an automobile. I approached the turn cautiously because it is a real short turn. They got a big danger sign there and I always heed those. I went around the curve about 20 miles an hour and then picked up to 35 miles an hour. Harry Herberger was sitting beside me in the front seat. George Drop was sitting in the rear seat. They said that the train was coming but I saw it all the time. I glanced over my shoulder to see the exact location of the train. I tried to keep an eye on it. I wanted to be sure there would be no mistake made and that the train was moving slowly. The train was moving on an angle while I was going straight. I did not see any signal as we approached the place where the railroad track crosses the hardroad. The last time I looked for the train before reaching the railroad track, we were a little over a block away, from where the accident happened. As near as I can remember when I looked back for the train I had to look through glass, that is of the side door, the door leading to the back seat. I saw it over my right shoulder and at that time it was between a quarter and a half mile from where the railroad crosses the hard road. We were traveling 35 miles an hour and I saw that there was no need for me to step on the gas or that there was no need to wait, that the train was a safe distance and just then something loomed up that turned out to be a truck. I put on the brakes but it didn't do any good. We were just a yard or two from the truck. I couldn't tell exactly because it just happened like a flash. When I saw this object I was about two yards from it. There was no light on the object.''

George Drop, Jr., who was riding in the rear seat of the cab referred to, gave the following account of how the collision happened:

"As we approached that turn I noticed a train. The train was about 250 feet south of the cross road. The cross road is about a block or a block and a half east of the hardroad. I am familiar with the speed of an automobile. We were going between 30 and 35 miles an hour. I was in the back seat on the right hand side. When we went around the turn I noticed the train and I kept looking backwards at the train, and in front of us, all the time looking back and forth, and when we got up to the crossing I look and I look around, I didn't see any lights flash or anything. It seemed like to me that the train was about 12 or 15 feet from the crossing, and then I looked around and when I looked around I looked up and seen the truck right in front of us. The crossing I have reference to is the hard road crossing, where these railroad tracks are. When we got there I seen the truck right in front of it and I hollered out; that is all I remember. . . . I didn't see any light on the truck."

The appellee testified concerning the collision, as follows:

"I was riding at the right side of the driver. Thomas Spiers was driving. George was in the back seat. Tom was driving about 35 miles an hour. I am acquainted with the road from Girard to Virden. I traveled it a great deal when I lived there. . . . On this night I saw a freight train about 250 to 300 feet south of the dirt road. I observed the train. I don't recall how long it was. The train was traveling between 10 and 15 miles an hour, a very slow train. It is 465 feet from where the dirt road crosses up to the tub that flashes the lights. When we made the turn, the train was south of the dirt crossing. . . . From time to time I looked around to see if the train was coming and I told Tom he had plenty of time to cross without any danger to ourselves. At the time that we came up within a block of the place where the railroad crosses the hard road, the train was then

about even with the dirt road, just a little bit north of it. Then I turned around and looked in front. I don't recall the crash. I recall seeing the truck and the crash about the same time. It was just a matter of seconds from the time I looked at the train the last time, until the crash occurred. When I saw the truck, we were about two or three yards from it. I was looking straight ahead when the crash came. . . . . Tom stepped on his brakes. I could feel the car waver. He was traveling between 30 and 35 miles an hour; before he made the turn he slowed down a little bit at the turn and then he stepped on it. There was no light on the thing we crashed into. The signal lights at the crossing had not begun to flash when we crashed. There is a light there at the crossing, but it had not flashed.''

The case was tried and submitted to the jury on the issues raised by the charges of negligence made in the first and second counts of the amended declaration. The first count charges that:

''The defendant, by its duly authorized agent and servant was in the use, possession and control of a motor vehicle known as a motor truck and trailer and was operating the same along a public highway known as Route 4 of the State System of Durable Hard Surfaced Roads in the State of Illinois. And it was then and there the duty of the defendant to use care and caution so as not to injure persons driving upon the highway, in the exercise of reasonable care for their own safety; but the defendant disregarding that duty and in the night time, at about 10 o'clock p. m. at a point about one mile south of the City of Virden, Illinois, the defendant, through its agent, carelessly and negligently stopped its motor truck with trailers attached and allowed them to remain standing on the slab of the highway without any lights thereon and without any means of warning travelers, and as the results thereof the defendant, through its servant, did

then and there carelessly and negligently create a dangerous condition to persons traveling upon the highway.''

The second count charges that the collision occurred in consequence of appellant's negligence in violating section 17 of the Motor Vehicle Act, Cahill's St. ch. 95a, ¶ 17, in operating its truck and trailers. The section referred to requires that:

''When upon any public highway in this State, during the period from one hour after sunset to sunrise, every motor bicycle shall carry one lighted lamp and every motor vehicle two lighted lamps showing white lights, or lights of a yellow or amber tint, visible at least two hundred (200) feet in the direction toward which each motor bicycle or motor vehicle is proceeding, and each motor vehicle, trailer or semi-trailer shall also exhibit at least one lighted lamp which shall be so situated as to throw a red light visible in the reverse direction.''

The injuries suffered by the appellee were very serious and included a fractured knee, a dislocated hip, as well as many serious cuts, contusions, bruises and lacerations all over the body.

One of the errors assigned by appellant relates to the sustaining of a demurrer by the court to the special pleas filed by the appellant as a defense to appellee's right to recovery in this action. The special pleas set out a certain agreement in writing by virtue of which the appellee is alleged to have received the sum of $1,250 in settlement for the damages sustained by him; and that the sum mentioned was received from certain persons; namely, H. L. Mays, J. E. Spiers and Thos. Spiers, owners and operators of the automobile taxi in which appellee was riding at the time of the collision. The written instrument referred to is as follows:

''PURCHASE OF PEACE

''In consideration of the payment of One Thousand Two Hundred Fifty and no 100 Dollars to Harry Her-

berger by H. L. Mays, J. E. Spiers and Thos. Spiers, the receipt and sufficiency of which is acknowledged, it is hereby covenanted and agreed by and between said Harry Herberger and H. L. Mays, J. E. Spiers and T. Spiers, that no action will be instituted or maintained by said Harry Herberger against said H. L. Mays, J. E. Spiers & T. Spiers because or on account of anything concerning or relating to a certain accident, whereby said Harry Herberger suffered severe and permanent personal injuries and property damage on or about the 28th day of September, 1930.

"It Is Further Covenanted and Agreed That this instrument shall never be construed as a release nor the execution evidenced as an accord and satisfaction.

"Witness My hand and seal this 30th day of October, 1930.

"(Signed)    Harry Herberger    (Seal)"

It is also assigned as error that the court, on the trial of the cause, refused to admit in evidence the written instrument above set forth. It is the contention of the appellant that H. L. Mays, J. E. and Thomas Spiers were joint tort-feasors with the appellant in the tort charged in the declaration which is alleged to have resulted in appellee's injuries; and that the written instrument shows a settlement of appellee's cause of action by several parties who were joint tort-feasors with appellant; and that a settlement made by one joint tort-feasor for the injuries and damages sustained by the commission of a tort, operates as a discharge of the liability of the other tort-feasors.

It is sufficient to say concerning this contention that the written agreement referred to does not sustain appellant's assertion that the parties to the agreement who paid the $1,250 to appellee, which was accepted by him under the agreement referred to, were joint tort-feasors with the appellant. The agreement mere-

ly recites that in consideration of the $1,250 the appellee will not institute nor maintain any action against the parties mentioned on account of or concerning or relating to the accident in question, whereby the appellee suffered severe and permanent personal injuries. The language in the instrument does not imply any joint liability of appellant concerning which the appellee agreed not to sue or maintain the legal action charged in the declaration against the appellant; and it is clear from the declaration itself that the charges of negligence made therein do not refer to the same liability. We are of the opinion, therefore, that the written instrument which was embodied in the special pleas did not contain any matters which would be a defense to the appellee's right of recovery in this action and that the demurrer was properly sustained to the special pleas and that there was no error in ruling out the written instrument on the trial.

It is also contended by the appellant that there is no evidence of negligence on the part of the appellant's servant, the driver of the truck in question; and that therefore the court should have directed a verdict finding the appellant not guilty. The driver of appellant's truck testified on the trial that he hung a red oil lantern on the rear end of the trailer and that he saw the lantern burning shortly before reaching the scene of the collision. His testimony on this point is as follows:

"We carry a lantern for a tail light. I looked at the rear end of the trailer. This was about a quarter of a mile from the railroad tracks and there was a lantern on the rear trailer and it was burning. There was glass on this lantern and its color was red. It was an oil burning lantern. . . . At the time I came around the curve a quarter of a mile from the scene of the collision, the red lantern was hanging on the rear of the trailer."

On cross-examination he said:

"I didn't get off at the corner to see if this lantern was burning. I could see it plain. I looked around when I turned the corner and made the curve. I could see it from the cab in front. I had two trailers on that night. I am not sure, but I think I put the lantern on at Gillespie. That is the only tail light I had."

The Motor Vehicle Act requires not only a red light on the rear of the trailer but also a red light on each motor vehicle or trailer and which lights "shall be so situated as to throw a red light visible in the reverse direction." Cahill's St. ch. 95a, ¶ 17.

Whether the red oil lantern testified about by the driver, was burning at the time of the collision; and whether it was so situated as to throw a red light visible in the reverse direction from that which the truck and trailers were going, and also whether the light testified about was such as complied with the requirements of the law, were questions of fact for the jury to determine; and the court therefore properly overruled the motion to direct a verdict. The evidence in the record shows negligence in failing to comply with the requirements of the Motor Vehicle Act; and tends to show that appellant's failure to comply with the requirements of the law created a dangerous condition to travelers along the public highway, approaching the rear of appellant's truck and trailers.

Another contention made by the appellant for reversal of the judgment is that the appellee was guilty of contributory negligence. This was also a question for the jury to determine; and the determination of the jury was adverse to appellant's contention. Our conclusion from the evidence is that the jury were warranted in the finding which they made.

Another reason urged by appellant for reversal of the judgment is that a certain part of the argument

of counsel for appellee on the trial was prejudicial. The part referred to is as follows:

"Mr. Stone: Are we going to permit these trucks to use our hard roads? There should be a law against it. Personally I am opposed to these monstrous trucks being seen upon our hard roads.

"Mr. Pefferle: I object to that as an attempt to create prejudice in the mind of the jury against the truck—

"The Court: Objection sustained. Trucks have the same right on the hard road that automobiles do. Proceed with the argument."

The court sustained an objection to the statement made by appellee's counsel, and supplemented its ruling with the remark: "Trucks have the same right on the hard roads that automobiles do." The remarks of counsel to which the court sustained an objection were merely the expression of opinion, which though improper as a part of an argument in the cause, we conclude were not calculated to prejudice or mislead the jury in the consideration and determination of the real issues submitted for their determination; and therefore there is no reversible error involved in this feature of the case.

The appellant also complains that there is error in the giving of the appellee's instructions and in the refusal of some of appellant's instructions. We find, however, that the appellee's instructions are substantially a correct statement of the law as applicable to the issues presented to the jury for their determination and to the facts proven. We find no error in the refusal of appellant's instructions, inasmuch as the matter contained in the refused instructions, to which the appellant was entitled, was given to the jury in other instructions. The record does not disclose any reversible error. The judgment is therefore affirmed.

*Affirmed.*